J-S55025-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DERRICK WHITE | |
| Appellant | No. 4056 EDA 2017 |

Appeal from the PCRA Order December 7, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0012991-2010

BEFORE:  OLSON, STABILE, JJ., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 25, 2019**

Appellant, Derrick White, appeals from an order dated December 7, 2017 denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.  We affirm.

During Appellant's direct appeal, this Court summarized the factual and procedural history of this case as follows:

> In January 2006, Abdul Taylor ("Victim") was with Nafeas Flamer and Hakim Bond at 22nd Street and Sigel Street in South Philadelphia.  Mr. Flamer was waiting for Allen Moment, Jr. to return a gun he had taken from Mr. Flamer.  As Victim walked down the street with Mr. Flamer and Mr. Bond, they were shot at from behind.  Mr. Flamer later told Victim it was a set-up, and indicated a desire to seek revenge on Mr. Moment.  On January 18, 2006, Victim encountered Mr. Flamer and Mr. Bond in a lot on Ellsworth Street with some other individuals, several of whom were armed.  Victim heard Mr. Flamer say, "He's outta here and we going down there tonight," to which someone else responded, "We not going down there tonight. You drawing."  Victim believed they were plotting to kill Mr. Moment, so he left and informed his mother of the plot.  On the evening of January 20, 2006, Tyree

Branch came to Victim's house and told him that Mr. Flamer and Mr. Bond were mad at Victim because he refused to "ride with them to go see [Mr. Moment.]" Approximately one hour later, Victim heard Mr. Flamer's grandmother scream. Victim looked outside and saw Nafeas Flamer's uncle, Marvin Flamer, run and get into a car. Later that night, police responded to a radio call reporting a shooting on the 2800 block of Ellsworth Street. Police found Mr. Moment lying in the street with multiple gunshot wounds. Mr. Moment was admitted to the hospital in critical condition.

In another incident on May 21, 2007, police responded to a radio call of a person with a gun on the 2300 block of Ellsworth Street. When they arrived, they found Richard Smith lying on the ground with multiple gunshot wounds. On the way to the hospital, Mr. Smith told police he believed he was about to die and that he was shot by Nafeas Flamer and [Appellant]. Mr. Smith, who survived the shooting, confirmed that Nafeas Flamer and [Appellant] were the shooters in a subsequent statement to the police.

Mr. Moment remained in critical condition for over two years and eventually died on August 6, 2008, from injuries he suffered in the 2006 shooting. Shortly before he died, Mr. Moment gave a statement to the police about the shooting, which led to the arrests of Nafeas Flamer, Marvin Flamer, and Hakim Bond. All three individuals were charged with first-degree murder following Mr. Moment's death. Around the time that Mr. Moment died, Victim told his sister that the Flamers wanted Victim to state falsely that they were in Victim's studio on the night of Mr. Moment's shooting. Victim also told Mr. Moment's father that the Flamers and Hakim Bond had admitted killing Mr. Moment, and that they wanted Victim to provide them with a false alibi. Victim told Marvin Flamer, "No, I ain't giving you no alibi. I'm telling the truth, you know." On August 13, 2008, Victim gave a statement to the police describing his knowledge of Mr. Bond and the Flamers' plans to kill Mr. Moment. After Victim cooperated with police, he acquired a reputation in the community as a "snitch."

While incarcerated awaiting trial for the murder of Mr. Moment, Marvin Flamer called his mother, Geneva Flamer, on September 18, 2008, and said he needed to find out what type of evidence the Commonwealth had against him. Ms. Flamer said they had "the boy" listed as living at the address of Victim's girlfriend. Marvin Flamer asked if [Appellant] had "gone up there" yet, and

- 2 -

Ms. Flamer said no. Mr. Flamer then said, "Man, they bullshittin'. Like everybody sayin' they gonna do something, they don't do it."

[Appellant] visited Marvin and Nafeas Flamer in jail on multiple occasions. In a subsequent telephone conversation on May 6, 2010, Ms. Flamer told Marvin Flamer, "[Appellant] told me to tell you he send his love." That same evening, Victim visited his mother, who was cooking at her home. At one point, Victim left to buy sugar for his mother. While Victim was walking back to the house, [Appellant] approached Victim and shot him in the head. [Appellant] then fled the scene. The following day, a man known as "Strong" told Marvin Flamer over the phone that Victim had been killed. Marvin Flamer responded, "Aw. Aw, hey man, that hurt man." Two days after the shooting, Ms. Flamer relayed to Marvin Flamer a conversation with an unidentified person, stating, "He just said I told you I was comin' by. Said this is your Mother's Day present. Happy Mother's Day. Have yourself a beautiful weekend. Enjoy yourself, and he said I told you that I was gonna[,] Marvin, he said." The police apprehended [Appellant], who claimed he had killed Victim in self-defense. In [Appellant]'s confession, he said he was aware of a "rumor" that Victim had given a police interview in Mr. Bond and the Flamers' murder case.

Following the guilt phase of Appellant's trial, a jury convicted Appellant of first-degree murder, retaliation against witness, conspiracy, PIC and VUFA. On February 29, 2012, at the conclusion of the penalty phase, the jury returned a verdict of death for the offense of first-degree murder. The court immediately sentenced Appellant to death in accordance with the verdict and imposed no further penalty for the remaining offenses. Appellant filed an appeal with the Pennsylvania Supreme Court. The Court entered an order on July 2, 2013, which granted in part Appellant's petition for remand for the trial court to determine whether penalty phase counsel was ineffective. On remand, the trial court granted Appellant a new penalty phase hearing. Following that hearing, the court quashed the sole aggravating circumstance and sentenced Appellant, on March 23, 2015, to life imprisonment without parole for the murder conviction. The court sentenced Appellant to consecutive terms of three (3) to six (6) years' incarceration for retaliation against witness, and three-and-a-half (3½) to seven (7) years' incarceration for the VUFA convictions. The court also imposed concurrent terms of eight (8) to sixteen (16) years' incarceration for conspiracy, and one (1) to two (2) years' incarceration for PIC.

*Commonwealth v. White*, 1152 EDA 2015, at 1-6 (Pa. Super. Feb. 5, 2016) (unpublished memorandum). On February 5, 2016, this Court affirmed Appellant's judgment of sentence. On July 19, 2016, the Supreme Court denied Appellant's petition for allowance of appeal.

On June 10, 2017, Appellant timely filed a counseled PCRA petition. On October 19, 2017, the PCRA court filed a Notice of Intent to Dismiss under Pa.R.Crim.P. 907. In an opinion and order dated December 7, 2017, the PCRA court dismissed Appellant's petition. This timely appeal followed. The PCRA court did not direct Appellant to file a Pa.R.A.P. 1925 statement.

Appellant raises the following issues in this appeal:

I. Was the Appellant denied his rights under the Sixth Amendment of the U.S. Constitution and Article I, § 9 of the Pennsylvania Constitution when trial counsel ineffectively failed to challenge the voluntariness of Appellant's statement to police prior to and at trial?

II. Were Appellant's rights pursuant to the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, § 9 of the Pennsylvania Constitution violated based on after discovered evidence that Det. Pitts has a pattern, practice and custom of holding suspects and witnesses in isolation for prolonged periods for purposes of interrogation, coercing false statements from suspects and witnesses and physically and psychologically threatening and abusing witnesses and suspects?

III. Was Appellant denied his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, § 9 of the Pennsylvania Constitution when trial counsel ineffectively failed to present evidence to refute the prosecutor's inferences concerning the September 18, 2008 recorded phone conversation?

IV. Was Appellant denied his rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, § 9 of the Pennsylvania Constitution when trial counsel ineffectively failed to move to preclude admission of photographs of Appellant and Flamer in the CFCF visiting and counsel on direct appeal and ineffectively failed to assert a claim that the prosecution violated *Brady v. Maryland* when it failed to turn over to the defense Flamer's CFCF Visitor Logs and presented evidence which falsely inferred that Appellant had visited and conspired with Flamer three hours prior to the shooting to commit the crime?

V. Is Appellant's life without the possibility of parole sentence a "cruel and unusual punishment" under Article I, §§ 1, 9 and 13 of the Pennsylvania Constitution and the Eighth and Fourteenth Amendments to the U.S. Constitution?

VI. Were Appellant's constitutional rights to due process of law and a fair trial violated by the cumulative impact of trial counsels' ineffectiveness in violation of the Sixth Amendment?

Appellant's Brief at 3-4.

This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *Commonwealth v. Halley*, 870 A.2d 795, 799 n.2 (Pa. 2005). We will not disturb the PCRA court's findings unless there is no support for the findings in the certified record. *Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001).

To obtain PCRA relief for ineffective assistance of counsel, the petitioner must establish (1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth*

***v. Zook***, 887 A.2d 1218, 1227 (Pa. 2005). The petitioner bears the burden of proving all three prongs of this test. ***Commonwealth v. Meadows***, 787 A.2d 312, 319–20 (Pa. 2001). "Counsel is presumed to be effective and Appellant has the burden of proving otherwise." ***Commonwealth v. Holloway***, 739 A.2d 1039, 1044 (Pa. 1999). "A defendant's failure to satisfy even one of the three requirements results in the denial of relief." ***Commonwealth v. Miller***, 987 A .2d 638, 649 (Pa. 2009).

When the PCRA petition or the Commonwealth's answer raises material issues of fact, the PCRA court shall order a hearing. Pa.R.Crim.P. 908(A)(2). The court should hold an evidentiary hearing when the petitioner sets forth sufficient facts upon which the court can conclude that trial counsel may have been ineffective. ***Commonwealth v. Pettus***, 424 A.2d 1332, 1335 (Pa. 1981).

Appellant asserts that trial counsel was ineffective for failing to move to suppress his statement to police on the basis that police obtained it through coercion. Appellant contends that the detectives who questioned him punched and choked him, psychologically abused him, and forced him to sign the statement. Moreover, Appellant claims, he and his grandmother informed his attorneys about the detectives' conduct, but they still neglected to move to suppress the statement. The record—particularly Appellant's trial testimony— belies Appellant's allegations of abuse.

Police detectives initially questioned Appellant on June 12, 2010, and he claimed he had an alibi that proved he was not the perpetrator. The detectives immediately questioned the person Appellant identified as his alibi witness, but that person could not provide an alibi. N.T. 2/21/12, 121-41 (suppression hearing); 2/24/12, 90-91 (trial).

One month later, on July 22, 2010, the same detectives informed Appellant that his DNA was found on items recovered near the crime scene. At that point, Appellant stated that he shot the victim in a moment of terror. He claimed that the victim had threatened him numerous times in the past, and when the victim walked up to him from behind, he panicked and shot him out of fear. N.T. 2/21/12, 141, 145 (Detective Pitts' suppression hearing testimony); 2/24/12, 90-107, 112-14 (Detective Pitts' trial testimony). Detective Pitts, who took Appellant's statement, testified that neither he nor anyone else threatened Appellant or used force against him to induce his statement. N.T. 2/21/12, 143-45 (suppression hearing); 2/24/12, 95-96 (trial). Appellant testified at trial that the written statement accurately reflected what he told the detectives, and that his version of events in the statement was what actually happened. Significantly, Appellant never claimed that the detectives had threatened or abused him or forced him to provide a statement. On the contrary, he admitted that (1) all of the constitutional warnings printed on the statement were read to him; (2) as represented by the statement, he voluntarily waived his right to remain silent and did so of

"[his] own free will, without force or fear, and without any threats or promises having been made to [him];" and (3) he responded affirmatively to the prosecutor's question that "[t]he fact that there were no threats or promises, that's all true." N.T. 2/24/12, 94-98; 2/27/12, 36. Appellant cannot now contradict his own sworn testimony in order to obtain post-conviction relief. *Commonwealth v. Bishop*, 645 A.2d 274, 277 (Pa .Super. 1994) (appellant could not claim that he was entitled to post-conviction relief because trial counsel had coerced him into waiving his jury trial right, where he testified during colloquy before trial that he voluntarily waived that right).

In a footnote in his brief, Appellant concedes that he never claimed at trial that he was threatened or abused by the detectives despite being asked how they treated him. Appellant claims that he did not reveal the detectives' tactics during his trial testimony "because he thought that he could only discuss the abuse at the suppression hearing and that he no longer had the ability to do so." Appellant's Brief at 14 n.2. In fact, prior to Appellant's testimony, the court instructed the jury, in Appellant's presence, that they could consider Appellant's statement only if they first determined that he had voluntarily provided it. N.T. 2/24/12, at 88-89. Thus, Appellant was well aware when he testified that the voluntariness of his statement, and any alleged abuse by the detectives, was relevant. Additionally, Appellant had an obligation to testify truthfully, and as demonstrated above, his testimony

established that he voluntarily provided the statement to the police. For these reasons, Appellant's first argument is devoid of merit.

In his second argument, Appellant claims that he deserves a new trial based on after-discovered evidence that Detective Pitts, one of the detectives who took his custodial statement, had a prolonged pattern of coercing false statements from defendants and witnesses in other cases. The PCRA court properly denied this argument.

To obtain a new trial based upon after-discovered evidence, "the defendant must prove, by a preponderance of the evidence, that the evidence: (1) could not have been obtained before the conclusion of trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict." *Commonwealth v. Murray*, 174 A.3d 1147, 1153 (Pa. Super. 2017).

Appellant submitted a decision in another Philadelphia case[1] detailing Detective Pitts' lengthy pattern of abusive conduct during interrogations of defendants in other cases. To begin with, this evidence would not likely result in a different verdict. Regardless of what Detective Pitts did in other cases, Appellant's **own testimony** at trial establishes that his **own statement** to the detectives was voluntary. Before Appellant testified, he heard the judge

---

[1] *Commonwealth v. Dwayne Thorpe*, CP-51-CR-0011433-2008 (C.P. Phila., Nov. 3, 2017).

instruct the jury to refrain from considering his statement to the police unless it first determined the statement was voluntary. Then, when he took the stand, he took an oath to testify truthfully. Under these circumstances, had the detectives actually coerced him into giving a confession, he would have said so. Appellant, however, said the opposite. He admitted during his testimony that the detectives read the required constitutional warnings to him, that he voluntarily waived his right to remain silent, and he responded affirmatively to the prosecutor's question that the detectives made no threats or promises. Accordingly, we decline relief, as we did in another recent decision involving Detective Pitts. *See Commonwealth v. Brown*, 134 A.3d 1097, 1108-09 (Pa. Super. 2016) (allegation that Detective Pitts used coercive interrogation tactics in other cases did not warrant new trial where witnesses "would allege that Detective Pitts committed misconduct in coercing their statements in other murder cases, but none of the witnesses can provide any new evidence concerning his conduct in this case"); *see also Commonwealth v. Johnson*, 179 A.3d 1105, 1123 (Pa. Super. 2018) (detective's criminal convictions in unrelated matter years after appellant's trial were not newly discovered evidence, "for there is no evidence the former detective did anything inappropriate in the instant matter"); *Commonwealth v. Foreman*, 55 A.3d 532, 537-38 (Pa. Super. 2012) (appellant failed to satisfy fourth prong of after-discovered evidence test where appellant filed to

show any nexus between his case and criminal charges filed against case officer on unrelated matter).

In addition, evidence of Detective Pitts' conduct in other cases did not warrant relief because it would only have impeached his credibility without undermining belief in the voluntariness of Appellant's statement in the present case—a fact which, as discussed above, Appellant's own testimony establishes. *Brown*, 134 A.3d at 1109 (new trial denied where witnesses' testimony about Detective Pitts' misconduct in other cases "would solely be used to impeach Detective Pitts' credibility"); *Foreman*, 55 A.3d at 537-38 (criminal charges against detective in unrelated matter does not meet the after-discovered evidence test since such evidence would be used solely to impeach detective's credibility).[2]

Next, Appellant argues that trial counsel was ineffective for failing to refute inferences that the prosecutor drew from the telephone conversation that Marvin Flamer had from prison with his mother, Geneva Flamer, on September 18, 2008. No relief is due.

The conversation in question took place while Flamer was in prison awaiting trial for the murder of Allen Moment. The Commonwealth introduced the recording as evidence that Flamer, one of Appellant's co-conspirators,

---

[2] On August 28, 2018, Appellant filed an application for remand listing additional cases in which Detective Pitts allegedly committed misconduct during interrogations. We deny this application for the reasons provided on pages 9-11, *supra*.

wanted Appellant to confront the victim in the present case because he was a potential witness in the Moment case. Isolating three lines in the recording, Appellant claims that the conversation was actually about a newspaper's misprint of Flamer's nephew's address and that trial counsel were ineffective for failing to "refute the prosecutor's inferences" that the conversation was evidence of Flamer's desire for defendant to confront the victim.

Review of the entire conversation establishes that Appellant's argument lacks merit. The relevant portion of the conversation was as follows:

Flamer: I need to find out what type of evidence that they have, man.

Geneva: What type of what?

Flamer: Evidence do they have against me. I need to find out from David Walker, my lawyer.

Geneva: The got them in the paper again today.

Flamer: For what?

Geneva: The review.

Flamer: Oh.

Geneva: They got the boy listed as living [at] 1800 N. 29th Street. This shit getting on my nerves. I'm just really fucking fed up with everything. Getting on my nerves, for real.

Flamer: North 29th Street.

Geneva: Huh?

Flamer: North 29th Street.

Geneva: Yeah.

Flamer: They ain't got me in there?

Geneva: Him and the boy in there, him and the boy is in there. Yeah.

Flamer: Yo, did what's his name and them go up there?

Geneva: Who?

Flamer: Heavy [Appellant] and them.

Geneva: Heavy?

Flamer: Yeah, did they go up there?

Geneva: No.  Hold on a minute, hold on.

Flamer: Got (indiscernible). (Indiscernible) the PP number.

Geneva: Yeah.

Flamer: Yeah.

Geneva: No, they ain't go up there yet.  (Indiscernible).

Flamer: Man they bullshittin'.  Like everybody saying they gonna do something, they don't do it.

Geneva: Well they said they was goin'.  That's all I can tell you.  I don't have, I can't make nobody do nothing.  Yeah, I don't want (Indiscernible, talking to someone in the background).

Flamer: Ah, man.

Geneva: Oh Lord.

Flamer: Like I ain't getting nowhere man.  I'm thinking . . .

Geneva: I know.  I ain't getting nothin' but a damn headache 'cause I'm tired of it.

Commonwealth Trial Exhibit C-32.  Flamer's own words show that he was concerned about the evidence the prosecution had against him for killing

Moment; that he wanted Appellant to "go up there" and "do something" about the case; and that when he learned that Appellant had not "go[ne] up there yet," he became upset: "Man they bullshittin. Like everybody saying they gonna do something, they don't do it." The evidence belies Appellant's claim that the conversation was actually about a newspaper's misprint of Marvin's nephew's address.

Next, Appellant argues that trial counsel was ineffective for failing to move the Commonwealth from asserting that Appellant met with Marvin Flamer at the prison three hours before Victim's murder. In support of this argument, Appellant emphasizes that the prison visitor logs for Flamer did not list Appellant as one of his visitors. Appellant further contends that direct appeal counsel provided ineffective assistance by not claiming that the Commonwealth violated **Brady v. Maryland**, 373 U.S. 83 (1963), by not providing the logs to defendant prior to trial.

Appellant's ineffectiveness claim against his trial counsel lacks merit. The Commonwealth introduced a recorded conversation between Flamer and his mother just three hours before the murder in which Flamer stated that he saw Appellant earlier that day. Further, despite claiming on the witness stand that the prison logs would not reflect that he visited Flamer, Appellant conceded he saw Flamer in prison and even took two photographs with him there. N.T. 2/27/12, 46-47. The photographs demonstrate that Appellant visited Flamer at least twice, because Appellant was wearing different shirts

in each photograph. This evidence entitled the Commonwealth to claim that Appellant met with Flamer on the date of Victim's murder.

Appellant's **Brady** argument fails as well. To establish a **Brady** violation, the defendant must show that "(1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." **Commonwealth v. Lawrence**, 165 A.3d 34, 47 (Pa. Super. 2017)). It does not appear that the Commonwealth suppressed the visitor logs. Appellant claimed that they did not include his name, thus suggesting that he knew what they stated. Moreover, they were not material, because the evidence described above shows that Appellant visited Flamer multiple times, including the day of Victim's murder.

Next, Appellant claims that his sentence of life imprisonment without parole for his first-degree murder conviction is unconstitutional under **Miller v. Alabama**, 567 U.S. 460 (2012). **Miller** held that the Constitution prohibits mandatory life sentences without parole for juvenile offenders. Appellant, however, was twenty years old, and not a juvenile, when he committed these crimes. Thus, as of this date,[3] **Miller** does not apply to him, so the PCRA

_____

[3] We note that we are presently reviewing, _en banc_, whether a PCRA petitioner who was eighteen years and nine months old may obtain relief under **Miller**. **See Commonwealth v. Lee**, 1891 WDA 2016. We make no prediction about the ultimate outcome of that case.

court properly denied this claim. ***Commonwealth v. Furgess***, 149 A.3d 90, 93-94 (Pa. Super. 2016) (nineteen-year-old appellant not entitled to relief under ***Miller***; rejecting argument that he should be considered a "technical juvenile").

Finally, Appellant claims that the cumulative prejudice resulting from the totality of the errors undermined the fundamental fairness of his trial and denied him due process. This argument fails because none of his arguments have merit. ***Commonwealth v. Sneed***, 45 A.3d 1096, 1117 (Pa. 2012) (no basis exists for cumulative prejudice claim where all individual claims are without merit).

For these reasons, the PCRA court properly denied Appellant's PCRA petition.

Order affirmed. Application for remand denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/25/19